IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

THOMAS MARK SETTLE,

      Plaintiff,

v.                                 CASE NO. 2:11-cv-0554

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

## M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Both parties have consented in writing to a decision by a United States Magistrate Judge.

Plaintiff, Thomas Mark Settle (hereinafter referred to as "Claimant"), filed an application for DIB on June 19, 2009, alleging disability as of March 15, 1984, due to back pain, left shoulder/arm pain, neck pain, leg pain, nervous condition, osteoarthritis, fibromyalgia, and insomnia.[1] (Tr. at 10, 136-37, 178-86, 187-93, 197-204.) The claim was denied initially and upon reconsideration. (Tr. at 10, 78-82, 86-88.) On September 23,

---

[1] Prior to the subject claim, Claimant filed a Title II application on October 15, 1986, which was denied at the initial level; he subsequently filed an application for Title II benefits on July 26, 1989, which was denied at the initial and reconsideration levels. On September 25, 1992, a favorable decision was issued with regard to Claimant's application for Title XVI benefits filed on July 22, 1991. The ALJ noted that Claimant continues to receive supplemental security income payments under Title XVI pursuant to this fully favorable decision. On March 6, 1996, Claimant filed another application for Title II benefits; a hearing was held on June 3, 1998, and an unfavorable decision was issued on August 28, 1998. The ALJ concluded that the legal doctrine of *res judicata* applied, but alternatively determined that the claimant was able to perform other work as of June 30, 1988, the date his insured status expired. Claimant filed another Title II application on February 15, 2001, and a different ALJ issued an order of dismissal based on *res judicata* on July 24, 2002. (Tr. at 10.)

2009, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 89-90.)  The video hearing was held on January 24, 2011 before the Honorable William R. Paxton.  (Tr. at 25-66, 100, 107, 128, 130.)  By decision dated February 8, 2011, the ALJ determined that Claimant was not entitled to DIB benefits from his alleged onset date of March 15, 1984, through his date last insured of June 30, 1988.  (Tr. at 10-21.)  The ALJ's decision became the final decision of the Commissioner on June 17, 2011, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-3.)  On August 15, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 404.1520(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 404.1520(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 404.1520(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits.  Id.  If

2

it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he did not engage in substantial gainful activity during the period from his alleged onset date of March 15, 1984, through his date last insured of June 30, 1988.  (Tr. at 12.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of lumbar disc disease, status post lumbar laminectomies, and borderline intellectual functioning.  (Tr. at 12-13.)  At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 13-15.) The ALJ then found that Claimant had a residual functional capacity for light work, reduced by nonexertional limitations. (Tr. at 15-19.) As a result, Claimant could not return to his past relevant work. (Tr. at 19.) Nevertheless, the ALJ concluded that Claimant could have performed jobs such as light packager, cashier, and laundry folder, which exist in

3

significant numbers in the national economy.  (Tr. at 20-21.)  On this basis, benefits were denied.  (Tr. at 21.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 50 years old at the time of the administrative hearing.  (Tr. at 35.)  He has a tenth grade education and has received a General Equivalency Diploma [GED].  (Tr. at 35.)  In the past, he worked as a surface miner, truck driver, construction laborer, hardware/feed store worker, and fast food worker.  (Tr. at 38, 165.)

4

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize the evidence pertinent to the relevant time period from Claimant's alleged onset date of March 15, 1984, through his date last insured of June 30, 1988 below.

Physical Health Evidence

Records indicate Claimant was treated on approximately 55 occasions by Luis A. Loimil, M.D. between April 26, 1984 and June 20, 1989, 47 times during the period from his alleged onset date of March 15, 1984, through his date last insured of June 30, 1988. (Tr. at 226-34, 237-45.)

On May 11, 1984, Dr. Loimil wrote in a "To Whom It May Concern" letter:

The above patient was examined by me on 4/26/84 with the chief complaint of low back pain radiating to the right lower extremity.

HISTORY: This patient states he was working on a piece of equipment while checking a hydraulic leak and fell on some pipes injuring his back on 7/20/81. He was taken to Oak Hill Hospital and told he had a strain of his back. He was off two weeks and then went back to work. He then went to New River Family Clinic where he was treated and was on Compensation for this injury. At the present time, he has been laid off for 1 ½ years and has been seen by Dr. Landis and Dr. Sayre in Beckley. He has continued to have low back pain since his injury radiating to both hips and legs down to the knees; worse in the right than left. He complains of numbness and tingling in the buttocks. He states that he has been getting progressively worse and he is trying to re-open his claim in order to obtain medical care for this injury. There is no history of previous injury; he is in good health; has no known allergies; takes no medications.

PHYSICAL EXAM: On exam, he is able to walk on his toes and heels but has pain in both; worse in the heels than in the tip toes. He has marked spasm of the paraspinal muscles and he is tender on palpation of the lumbosacral junction. He can flex down to 20" from the floor and has 20° of lateral bends and hyperextension; all of them very painful and with difficulty. The patellar reflexes are within normal limits, bilaterally; the ankle jerk is absent in the

5

left; present in the right.  Straight leg raising is 40°, bilaterally with the patient lying down with positive Lasegue's sign, cervical flexion and internal rotation of the hip.  He has a positive Bowstring sign, bilaterally; worse in the right than left.

X-RAYS: X-rays show the interspaces preserved.  There is no evidence of fracture or dislocation; there is no evidence of congenital abnormalities or bony lesions.

IMPRESSION: It is my impression that due to the severity of his symptoms and the findings on exam, this patient's claim should be re-opened for further studies including a CT-scan and EMG with a trial of conservative care with traction and physical therapy in the hospital.  I strongly recommend that this be approved if his case has been ruled Compensable and he is to get in touch with me for further checkup.

(Tr. at 232-33.)

On July 9, 1984, Claimant was admitted to Charleston General Hospital and underwent conservative treatment with traction physical therapy, EMG and CT-scan. (Tr. at 246, 363.)  Claimant was discharged on July 12, 1984 under Dr. Loimil's care.  Id.

On July 25, 1984, Dr. Loimil stated that the CT-scan showed Claimant had a herniated disc L-3, L-4 with "an area of increased density extending primarily to the left at approximately the level of the lumbosacral interspace consistent with a herniated disc at this level." (Tr. at 246, 270, 362, 363.)  He discussed the possibility of a myelogram with Claimant. (Tr. at 226.)  Dr. Loimil stated that Claimant decided to "defer the myelogram [until] after treatment with PT [physical therapy] and see if there is any improvement" while waiting for Compensation authorization.  Id.

Dr. Loimil's records dated between July 25, 1984 and January 14, 1986 show Claimant's attempts at physical therapy and the use of a TENS unit with mixed results, sometimes "improving" and at later visits "complaining of progressive pain." (Tr. at 226-28.)

6

The records also indicate an admission to Charleston Area Medical Center [CAMC] from March 24, 1985 through March 28, 1985 related to Dr. Loimil's treatment. (Tr. at 227.) A x-ray report dated March 25, 1985 from CAMC states:

> LUMBAR MYELOGRAM:
> Lumbar puncture was performed at L2-3 and Metrizamide was instilled into the subarachnoid space.  There is minimal asymmetry of filling of the nerve root sheath at the L5 S1 level on the left as compared to the right.  There is no evidence of a herniated nucleus pulposus.  There is small anterior extradural defect below the L5 S1 disc space posterior to the S1 segment that may be secondary to a bony spur.  No other abnormality.
>
> Review of the patient's previous CT scan suggests the possibility of a conjoined nerve root on the left at L5 S1.

(Tr. at 272, 364.)

On April 2, 1985, Syed A. Zahir, M.D., Raleigh Orthopedic Associates, evaluated Claimant for the Workers' Compensation Fund.  He stated:

> He has recently been under the care of Dr. Loimil...This patient still complains of low back pain with radiation of the pain to the left gluteal area, left posterior surface of the thigh.  He has been wearing TENS unit.
>
> He is able to get dressed and undressed without significant problem.  He can lean forward and bring his hands up to his knees.  Further flexion subjectivity is painful.  He has about 10° extension, 10-15° lateral flexion.  His both iliac crests are at the same level.  He has normal sensation of both lower extremities.  He has normal motor power in both feet, ankles, knees and hips.  Both knee and ankle reflexes are brisk.  Straight-leg-raising on both sides is up to 90°...
>
> The patient does have calluses present on both hands at the level of the MP creases bilateral.  He obviously has been using his hands to a certain extent in order to continue to have calluses.  Subjectively he complains of considerable amount of discomfort in the lumbosacral area, but objectively he does some restriction of motion, but no definite neurological deficit.  Although the patient tells me that he has been discovered to have a herniated disc and was recommended surgical intervention, I believe he is not going to be a very good candidate for surgery, however, the entire finding would depend on myelographic and CT scan reports which are not available to me.

7

(Tr. at 368.)

On September 10, 1985, Dr. Zahir re-examined Claimant for the Workers' Compensation Fund and stated: "In view of the fact that the patient still persists to have low back [pain], has had a positive myelogram, perhaps he would be a candidate.  I do not believe he has reached maximum improvement.  He still requires further treatment.  I would refer the patient back to Dr. Loimil."  (Tr. at 370.)

On January 14, 1986, Dr. Loimil wrote:

This pt. [patient] is getting progressively worse with left sciatica.  He wants to proceed with surgery.  The myelogram shows minimal changes and the scan done in July shows a disc L-5, S-1 in the (L).  We are going to request author. [authorization] for the laminectomy again since his condition has worsened but before proceeding with surgery, we are going to get a CT-scan for confirmation of his diagnosis.

(Tr. at 228.)

On January 23, 1986, Dr. Loimil stated in a letter to the Workers' Compensation Fund:

I am requesting authorization to admit him to the hospital for a lumbar myelogram and laminectomy if indicated as well as an additional twenty physical therapy treatments for his back.  He is still disabled at this time and it is anticipated he will remain disabled for a period of at least three months from the present date.

(Tr. at 248.)

On February 4, 1986, Dr. Loimil wrote: "This patient's condition is worse.  He wants to proceed with the exploration of the L-5, S-1 interspace and a letter was sent on 1/20/86 to Comp. [West Virginia Workers Compensation Commission] requesting this."

(Tr. at 228.)

On February 21, 1986, Dr. Zahir re-evaluated Claimant for the Workers'

8

Compensation Fund and concluded:

> The patient persists to have back pain and has been having radicular pain down his [sic] both thighs.
>
> Physical examination reveals that the patient is able to get dressed and undressed without difficulty. He can barely lean over and bring his hands up to his mid-thighs. Further flexion is extremely painful. He has considerable amount of splinting of the lumbosacral spine. He has hardly any extension, lateral flexion is only about 5 degrees in the dorsolumbar junction. He has normal sensation in both lower extremities, normal motor power in both feet, ankles, knees and hips. Both knee and ankle reflexes are not elicited. His straight leg raising on both sides is about 80-85 degrees with positive Laseque's sign.
>
> CLINICAL IMPRESSION: Herniated disc L5-S1.
>
> I believe this patient is still symptomatic, and he perhaps ought to be evaluated again after six months.

(Tr. at 371.)

On February 23, 1986, Claimant was admitted to the hospital and on February 24, 1986, Dr. Loimil performed "[e]xploratory laminectomy L5, S-1 and excision of herniated disc at the same level in the (L)." (Tr. at 228, 249, 377.) Claimant was discharged on February 27, 1986. Id.

On March 4, 1986, Dr. Loimil stated: "This pt. is doing well; the skin stitches were removed and the wound is healing well with no evidence of infection. He was advised to continue on limited activities and rt. [return] here in 8 wks. [weeks] for further checkup. The leg pain is markedly improved." Id.

On May 6, 1986, Dr. Loimil noted: "He is slowly improving. He is still unable to do significant lifting. I advised him to start increasing his activities, walking and to rt. here in 8 wks. for further checkup." Id.

On June 10, 1986, Dr. Loimil stated in his progress notes: "This pt. is still having

considerable discomfort.  We are going to request authoz. [authorization] from Comp. to start him in PT [physical therapy] for heat, massage, exercises and intermittent traction and he is to rt. here in 8 wks. for further checkup."  (Tr. at 229, 249.)

On July 29, 1986, Dr. Loimil noted: "This pt. is working with Voc. Rehab. [vocational rehabilitation].  I doubt that he will ever be able to return back to the mines as I stated before."  Id.

On September 23, 1986, Dr. Loimil stated:

> This pt. is doing about the same.  There is no significant change in his condition.  He was started in PT [physical therapy] for 6 wks. due to the persistence of pain and if this doesn't help him, we most likely will send him for a PPD rating.  I advised him to get in touch with DVR [Department of Vocational Rehabilitation] regarding being trained for a different type of work.

Id.

On August 8, 1986, Dr. Zahir provided an evaluation of Claimant to the Workers' Compensation Fund, wherein he concluded:

> Physical examination reveals that the patient is able to get dressed and undressed with minimal difficulty.  He can lean forward and bring his hands to his knees.  Further flexion is rather painful.  He has hardly 5 to 10 degrees of extension and 10 degrees of lateral flexion with pain.  He has normal sensation of both lower extremities.  He has normal motor power in both feet, ankles, knees, and hips.  Both knee and ankle reflexes are not elicited.  Straight-leg raising on the left is up to about 85 to 90 degrees.  On the right, it is up to about 80 degrees.
>
> This patient is only five months post-op.  He has not had any therapy and I believe he needs to build up his muscles in his back.  He will need William's flexion and spinal extension exercises.  In addition to that he needs to lose some weight around his waist.  Coughing and sneezing gives him some discomfort.  It is possible that the patient may need to have some epidural blocks given. This patient is only 26 years old.  He has not been operated on in the past.  He had no other disability in the past.  He is still symptomatic.  He perhaps ought to be evaluated again after a period of six to eight months.  I do not believe he can handle the heavy manual work.  I believe he will need

to be trained for a different vocation where he does not have to do any heavy lifting, pushing, or pulling.  He has a tenth grade education and has taken G.E.D.

Incidentally, this patient can walk on the tips of his toes as well as on his heels without much pain.  I believe he looks much better than he did before.

(Tr. at 372-73.)

On November 18, 1986, Dr. Loimil stated: "This pt. is working with DVR re: [regarding] being trained for a less strenuous type of work.  We are going to request authoz. from Comp. To provide him with a chair back brace and he is to rt. here in 8 wks. For further checkup." Id.

On March 10, 1987, Dr. Loimil's treatment notes state:

This pt. has a lot of functional complaints at the present time.  His left leg is giving away and he is unable to sleep, etc.  He states PT is still helping him. I feel at this point, he is disabled from returning to his old occupation as a coal miner but on the other hand, he has reached his maximum degree of recovery and should be referred for a PPD rating.

Id.

On April 9, 1987, Dr. Zahir re-evaluated Claimant for the Workers' Compensation Fund and concluded:

Physical examination reveals that the patient is 27 years old.  He has not worked since December, 1984.  He can get dressed and undressed without any problems.  He can walk on the tips of his toes as well as on his heels.  He can squat half the way with pain.  He has a healed scar present on the lumbosacral area approximately three inches long.  He can lean forward and bring his hands to his knees.  Further flexion is rather painful.  He has about 10 to 15 degrees of extension and 10 to 15 degrees of lateral flexion.  He has normal sensation of both lower extremities.  He has normal motor power in both feet, ankles, knees, and hips.  He does have some suggestion of weakness of the left quads as a result of pain in the back.  Straight-leg raising on both sides is almost up to 90 degrees...

I do not believe he can do any heavy manual work...

11

In view of the fact that the patient persists to have back pain, he may need to have further studies done...I would award him 15% permanent partial disability on his back.

(Tr. at 374-75.)

On September 8, 1987, Dr. Loimil's notes state:

This pt. is working with Voc. Rehab. We have a ltr. [letter] from Comp. Dated 1-21-87, that authozd. [authorized] a chair back brace. At that time we did not order one, but we need to req. authoz. from Comp. to renew the authoz. to provide him with a chair back brace.

(Tr. at 230.)

On October 13, 1987, Dr. Loimil stated in his treatment notes:

This pt. still has residual pain, with limited SLR [straight leg raising] to about 50° in the left. He can flex 60°, with marked difficulty regaining the upright position; hyperexten 20°, lateral bends 20°. He stated that PT was keeping him going and he doesn't feel that he will be able to return to his old occupation.

Id.

In a letter to Claimant's representative dated October 15, 1987, Dr. Loimil stated:

I feel that he, most likely, has reached the point of maximum recovery, other than for symptomatic treatment and occasional physical therapy to keep him going. I also feel that this patient will not be able to return to heavy labor and I strongly recommend the services of Vocational Rehabilitation for him to be trained in a more sedentary type of work.

(Tr. at 250.)

On December 15, 1987, Dr. Loimil noted: "This pt. is doing about the same, taking PT off and on. He was unable to get the brace before the authoz. run out and we are going to request from WCF that this be renewed." Id.

On February 2, 1988, Dr. Loimil stated in his treatment notes:

This pt. is complaining bitterly of pain. Today, exam. [examination] was not that impressive with 80° of flexion, 25° of hyperextension, and 20° of lateral

bends.  The SLR is 60° in the (L).  There is no neurological deficit.  The pt. has rec'd [received] 15% PPD [Permanent Partial Disability].  He was given Tylenol #3, to take p.r.n. for pain, 2 refills and rtn. [return] to our office in 4 wks for further check-up.

Id.

On February 16, 1988, Dr. Loimil noted that Claimant returned for a check-up early:

The pt. is still complaining.  It is hard to determine exactly how much pain he really has.  The Tylenol did not help and I gave him a presc. [prescription] for Phenaphen #4, to take p.r.n. for pain, 30 tabs, 2 refills.  We are going to req. authoz. from WCF to get a CT-scan from L-3 to sacrum and an EMG of the lower extremities.  Also copy of req. for authoz. For chair back brace.

Id.

On June 14, 1988, Dr. Loimil stated:

This patient is doing about the same; there is no significant change in his condition.  He is being evaluated by Voc. Rehab. and he is to be retrained for a machinist and we strongly recommend so.  I think that the main functional limitation that he has is heavy lifting, crawling or climbing to heights.  He was advised to proceed with this training and return to our office in 8 wks. for further check-up.

Id.

On June 21, 1988, L. Elliott, M.D., New River Family Health Center, reported that Claimant had a "[c]ontusion right neck.  4 days ago was working doing carpentry work, board fell from the ceiling and hit his left neck.  Initially was not sore but gradually has gotten worse...yesterday went back to work and had a lot of pain."  (Tr. at 378.)

On July 21, 1988, M. Herr, D.O., New River Family Health Center, stated that Claimant continued to have pain in the left side of his neck with difficulty turning his head fully and looking backwards.  His diagnosis was "[m]ild cervical strain, unresolved."  Id.

Although outside the relevant time frame (alleged onset date of March 15, 1984, through date last insured of June 30, 1988), it is noted that Claimant continued to be

treated by Dr. Loimil.  (Tr. at 231.) On February 7, 1989, Dr. Loimil stated:

> New injury.  Acute low back strain, superimposed on previous laminectomy.
> Low back pain radiating to the (L) leg.  This pt. was at his brother-in-law's on
> 1/31/89 and he stepped in a hole twisting his back.  He heard something pop
> and went to Raleigh General Hosp. E.R. where x-rays were taken and he was
> referred her for further evaluation and treatment.  He is taking Robaxisal and
> Oxycodone with ASA. On exam, reflexes, sensory and motor power are within
> normal limits.  The main problem is low back pain radiating to both hips.

(Tr. at 231.)

In notes dated February 21, 1989 and April, 4, 1989, Dr. Loimil notes that Claimant

"is not doing any better.  He is doing worse...is complaining of severe pain.  The CT-scan

and EMG have not been [approved] by the insurance company."  Id.

On September 15, 1989, Dr. Loimil stated in a letter to the Workers Compensation

Fund that in addition to the re-injury on January 31, 1989, on February 7, 1989 while

attending Vocational Rehabilitation school, Claimant "stepped over some pipe in the floor,

fell reinjuring his back." (Tr. at 253.) Dr. Loimil requested an EMG and CT-scan and stated:

"I anticipate a period of disability of one year from the present time, due to his condition

and I advised him to change his line of training due to the fact that he is not going to be able

to perform as a machinist, as he had planned in the past."  Id.

On October 2, 2008, Dr. Loimil wrote a one sentence letter to Claimant's

representative, which stated: "I reviewed my records regarding Mr. Settle and I feel he has

been continuously disabled due to his back condition from June 30, 1988 to the present

time." (Tr. at 380.)

On July 23, 2009, a State agency medical source attempted to complete a Physical

Residual Functional Capacity Assessment for Claimant's abilities during the time period of

July 15, 1984 to June 30, 1988.  (Tr. at 392-99.)  The evaluator, Caroline Williams, M.D.,

concluded that she was "unable to judicate [sic] case secondary to insufficient evidence to properly assess severity of Claimant's allegations for time period AOD [alleged onset date] = 07/15/84 to DLI [date last insured] = 06/30/88."

On September 11, 2009, a State agency medical source attempted to complete a Physical Residual Functional Capacity Assessment for Claimant's abilities during the time period of July 15, 1984 to June 30, 1988. (Tr. at 421-29.) The evaluator, Narendra D. Parikshak, M.D., concluded: "All available MER [medical evidence of record] reviewed; Insufficient evidence to properly assess severity of claimant's allegations for time period AOD 3/15/1984 to DLI - 06/30/1988." (Tr. at 428.)

Mental Health Evidence

On March 19, 1991, Claimant's initial psychiatric examination was performed by Ahmed D. Faheem, M.D. (Tr. at 284-86.) Although the report is outside the relevant time period, it shows that Claimant's psychiatric problems began in approximately September 1989:

> Mr. Settle indicated that he had problems with his nerves mostly for the past 1 ½ years. When asked about the kind of problems that he has with his nerves, Mr. Settle indicated, "I get upset easily, get aggravated. My back bothers me. I cannot sleep too good at night." The patient reportedly hurt his back in 1981. According to him, "I was working and fell on some pipes." The patient had surgery, discs removed in 1986. He feels in constant pain. The patient feels more and more snappy, irritable, and upset. He says that everything that he does aggravates his back. He has been depressed. He has hopeless, helpless feelings. He feels tired and run down. He has difficulty in concentration. He has been forgetful. He tends to lose interest in things. He has difficulty being around people...The patient has not had any formal psychiatric treatment. He has been seeing Dr. Loimil, who is treating him for his back...
>
> RECOMMENDATION: I feel that this gentleman has problems with recurrent depression which appears to be mostly of a moderate extent and appears to be mostly secondary to his injury of 1981 and pain and complications

resulting from the same. The patient is currently involved with Vocational Rehabilitation training, however, his motivation appears to be rather questionable. He may benefit from some outpatient treatment and counseling. The patient is already taking antidepressant medication, but they do not appear to be too helpful. The patient will need to be motivated further to complete his training and seek employment. He is too young to be involved with long term disability. He is competent to handle his own affairs.

(Tr. at 284-86.)

On July 25, 2009, a State agency medical source was unable to complete a Psychiatric Review Technique form [PRTF] for the time period of March 15, 1984 to June 30, 1988. (Tr. at 400-14.) The evaluator, Holly Cloonan, Ph.D., concluded that she had insufficient evidence to make a recommendation, stating: "No evidence exists for DLI POC 1984 - 1988." (Tr. at 412.)

On September 7, 2009, a State agency medical source, Debra Lilly, Ph.D., reviewed Dr. Cloonan's report and provided a case analysis, wherein she concluded: "I have reviewed all the evidence in file, and the PRTF of 07/25/09 is affirmed, as written." (Tr. at 419.)

Claimant's representative provided the office treatment notes of Dr. Faheem dated January 23, 1998 to November 12, 2010 showing 55 sessions, primarily for treatment of depression and anxiety. (Tr. at 431-70.) All the treatment was outside the relevant time period.

On December 28, 2010, Dr. Faheem completed a Medical Assessment of Ability to do Work-related Activities (Mental) form. (Tr. at 471-73.) He concluded that Claimant had a "fair", "poor" or "none" ability to do work-related activities in all areas, stating: "Because of the combination of his physical and psychiatric impairment, this is difficult." Id.

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial

16

evidence because the ALJ failed to give controlling weight to the opinion of Claimant's treating physician, Dr. Loimil, regarding Claimant's limitations and functional capacity. (Pl.'s Br. at 1-13.) Specifically, Claimant argues:

> The ALJ's decision fails to give substantial weight to the opinion of Dr. Loimil whose opinion is supported by his opportunity to examine and treat the plaintiff on numerous occasions and by appropriate clinical findings without any substantial evidence to support the examples which he cited to support his conclusion.
>
> The ALJ stated that the record contains some inconsistencies. He stated that on October 2, 1008, Dr. Loimil reported that the claimant was disabled since at least June 30, 1988; however, the undersigned notes that Dr. Loimil's own notes on June 14, 1988, indicate that the claimant's main functional limitation was heavy lifting, crawling, or climbing to heights. The claimant contends that Dr. Loimil consistently stated the claimant was unable to return to his former occupation and needed rehabilitation. However, due to the severity of the claimant's condition, he was unable to complete the rehabilitation plan, and, as a result, rehabilitation was not a success...
>
> The primary care provider, Dr. Loimil, reported that the claimant was disabled due to his back condition from June 30, 1988, to the present. The ALJ gave controlling weight to the opinion of a non-examining vocational expert.
>
> Dr. Loimil's opinion that the plaintiff had been continuously disabled due to his back condition from June 30, 1988, to the present was supported by all of his treatment records and several special reports prepared for his workers' compensation claim. The plaintiff's testimony was consistent with this finding. The record does not support the ALJ's attempt to discredit Dr. Loimil's opinion.

(Pl.'s Br. at 11-12.)

<u>The Commissioner's Response</u>

The Commissioner responds that substantial evidence supports the ALJ's determination that Claimant was not disabled within the meaning of the Social Security Act, 42 U.S.C. § § 401-33. (Def.'s Br. at 1-13.) Specifically, the Commissioner argues:

> The relevant period in this case runs from March 1984 through June 1988,

17

and evidence in the record that relates to that period shows that Plaintiff's limitations were moderate and are adequately accounted for by the ALJ's residual functional capacity [RFC] finding. Plaintiff alleged a back injury and related pain, but his treating physician prescribed a conservative course of treatment and reported that this treatment was generally successful. Plaintiff later had surgery after he aggravated his injury, but his treating physician still reported generally moderate symptoms. While Plaintiff's treating physician advised him not to return to his heavy past work as a miner, he repeatedly recommended that Plaintiff receive vocational training in lighter work. Finally, in June 1988, shortly before Plaintiff's date last insured, his treating physician opined that Plaintiff only had limitations in heavy lifting, crawling, and climbing, all of which were accommodated by the ALJ's RFC.

(Def.'s Br. at 1-2.)

Specifically regarding Dr. Loimil's, the treating physician, October 2008 statement,

the Commissioner argues:

In this case, Dr. Loimil's October 2008 statement that Plaintiff was "completely disabled" beginning on his date last insured over twenty years earlier is conclusory and unsupported by evidence in the record (Tr. 380). First, Dr. Loimil does not describe any functional limitations, and instead only opines that Plaintiff is "completely disabled" (Tr. 380). While an ALJ will regularly give weight to a treating physician's specific medical findings, the ultimate disability determination is an administrative finding reserved to the Commissioner. 20 C.F.R. § 404.1527(e). Next, Dr. Loimil's October 2008 opinion is completely conclusory; he does not cite to any examination, test, or any other evidence to support his assertion, and states only that he reviewed his records (Tr. 380). Finally, Dr. Loimil's opinion is contradicted by his notes from the relevant time period. As discussed above, Dr. Loimil regularly reported that Plaintiff's symptoms were only moderate and improving, and specifically recommended that Plaintiff received vocational training to perform work (See e.g., Tr. 226-30, 250). Indeed, on June 14, 1988, Dr. Loimil reported that Plaintiff was receiving job training as a machinist, recommended that Plaintiff continue pursing this training, and reported that Plaintiff's only functional limitations were in heavy lifting, crawling and climbing (Tr. 250). These contemporaneous reports from Dr. Loimil contradict his letter from twenty years later, and instead, support the ALJ's residual functional capacity determination. Accordingly, the ALJ's decision to give Dr. Loimil's October 2008 statement no significant weight is supported by substantial evidence...

(Def.'s Br. at 12.)

Analysis

Claimant argues that the ALJ erred in evaluating Dr. Loimil's opinion of October 2, 2008, which opined that Claimant was disabled since June 30, 1988, and his treatment notes of June 14, 1988, which indicated that Claimant's main functional limitations were that he could not do heavy lifting, crawling, or climbing to heights.  (Pl.'s Br. at 11-12.)  Claimant asserts that "Dr. Loimil consistently stated the claimant was unable to return to his former occupation and needed rehabilitation."  (Pl.'s Br. At 12.)

The ALJ made these findings regarding Dr. Loimil's reports, including the October 2, 2008 report, as well as the reports of Dr. Zahir for the relevant time period:

> With regard to the time period prior to June 30, 1988, when the claimant's insured status expired, the record reveals that Luis A. Loimil, M.D., examined the claimant on April 26, 1984, for complaints of low back pain that radiated to the right lower extremity; the claimant reported that he injured his back on July 20, 1981 and that he continued to experience symptoms of low back pain that radiated to both hips and legs as well as numbness and tingling in the buttocks...X-rays provided no evidence of fracture or dislocation and no evidence of congenital abnormalities or bony lesions; Dr. Loimil recommended a CT scan, electromyogram, and conservative treatment.  The claimant was admitted to the hospital on July 9, 1984, and a CT scan of the lumbar spine and electromyogram were performed.  The CT scan revealed evidence of a herniated disc and the electromyogram revealed evidence suggestive of bilateral lumbar root irritation.  On July 25, 1984, Dr. Loimil discussed a possible myelogram, but the claimant opted to proceed with a trial of physical therapy; on August 22, 1984, his symptoms were improved with physical therapy.  In November 1984, the claimant received a TENS unit to further control his symptoms of low back pain; on December 14, 1988, he continued to improve slowly (Exhibit C-3F).
>
> On March 20, 1985, the claimant's symptoms of back pain recurred and radiated to the left lower extremity; straight leg raising was positive.  He was admitted to the hospital on March 24, 1985, and underwent a lumbar myelogram that revealed a small anterior extradural defect at L5-S1; there was possibility of a conjoined nerve root on the left.  On April 2, 1985, Syed A. Zahir, M.D. examined the claimant and noted callouses on both hands consistent with the claimant using his hands to the extent to continue callouses.  The claimant reported significant discomfort in the lumbosacral

area and he had some restriction of motion, but no definite neurological deficit. Although the claimant reported that surgery had been recommended for a herniated disc, Dr. Zahir commented that the claimant would not be a very good candidate for surgery. On April 17, 2985, Dr. Loimil indicated that the claimant was improving again with physical therapy; on July 10, 1985, the claimant was referred to vocational rehabilitation. On September 10, 1985, Dr. Zahir examined the claimant and he reported persistent low back pain; straight leg raising was positive on the left and the claimant had impaired sensation to pinprick in both legs and feet; he was able to get dress[ed] and undressed, with some difficulty; and he could lean forward and bring his hands up to his mid-thighs. Dr. Zahir subsequently examined the claimant on February 21, 1986, and he was barely able to lean over and bring his hands to his mid-thighs; he had considerable splinting on his lumbosacral spine with significantly diminished range of motion. Dr. Zahir diagnosed herniated disc L5-S1 and recommended surgical intervention (Exhibit C-3F).

On February 24, 1986, the claimant was admitted to CAMC and Dr. Loimil performed a partial hemilaminectomy of L-5 and S-1 with excision of disc. The claimant followed up with Dr. Loimil on March 4, 1986, and he was doing well; his leg pain was markedly improved. On May 6, 1986, the claimant continued slow improvement; on June 10, 1986, he continued to experience discomfort and physical therapy was recommended. The claimant worked with vocational rehabilitation in 1987, and on October 13, 1987, he continued to report residual pain; he had markedly difficulty regaining the upright position following flexion testing of his lumbar spine, but reported that physical therapy was productive. On October 15, 1987, a straight leg raising was limited on the left; Dr. Loimil recommended that the claimant be prescribed a back brace and that he should continue physical therapy. He indicated that the claimant was unable to return to heavy labor. On December 15, 1987, the claimant continued to do about the same with occasional physical therapy; he was subsequently issued a back brace. On February 2, 1988, the claimant's complaints of pain intensified somewhat; however, his examination was not that impressive. On February 16, 1988, his complaints persisted and Dr. Loimil indicated that the claimant's level of pain was hard to determine. On June 14, 1988, the claimant was being evaluated by vocational rehabilitation for possible training for a machinist; this opinion is supported by Dr. Loimil who reported that the claimant's main functional limitation was heavy lifting, crawling, and climbing to heights. On June 21, 1988, the claimant reported to his primary care physician that his neck was injured four days prior while he was doing carpentry work; his pain gradually worsened and he experienced significantly increased pain when he returned to work on June 20, 1988. The claimant had pain with lateral flexion and rotation of his neck, but full range of motion; he was diagnosed with left neck contusion with probable residual muscle spasm. On July 21, 1988, the claimant continued to report pain in the left side of his neck with associated

difficulty turning his head and looking backwards while using his arms over his head; M. Herr, D.O., diagnosed mild cervical strain, unresolved. In December 1988, the claimant was going to school, with no significant change in his condition; a three-month follow up was scheduled. The claimant reinjured his back in January 1989; however, this is beyond the expiration date of his insured status, June 30, 1988 (Exhibit C-3F).

On October 2, 2008, Luis A. Loimil, M.D., reported that the claimant was continuously disabled since June 30, 1988 (Exhibit C-4F). As noted above, the undersigned finds no objective evidence to support this statement. Furthermore, the statement that a claimant is "disabled," "unable to work," can or cannot perform a past job, meets a Listing or the like are not medical opinions but are administrative findings dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein. Such issues are reserved to the Commissioner...

This record contains some inconsistencies. For example, on October 2, 2008, Dr. Loimil reported that the claimant was disabled since at least June 30, 1988 (Exhibit C-4F); however, the undersigned notes that Dr. Loimil's own notes on June 14, 1988, indicate that the claimant's main functional limitation was heavy lifting, crawling, or climbing to heights (Exhibit C-3F, page 83). Additionally, the undersigned notes that on or about June 17, 1988, the claimant was doing carpentry work when a board fell and injured his neck; on July 21, 1988, Dr. Herr indicated that the claimant could continue to work beginning July 25, 2008 (Exhibit C-3F, page 106).

As to the effectiveness of treatment prior to June 30, 1988, the claimant testified that his condition was not as limiting in 1988 as it is currently. Prior to June 30, 1988, the claimant did not receive the type of medical treatment one would expect for a totally disabled individual; he was referred to vocational rehabilitation and subsequently returned to some type of work. Although the claimant received various forms of treatment for the allegedly disabling symptoms, the record reveals that prior to June 30, 1988, the treatment was generally successful in controlling those symptoms.

As to the side effects of medications, prior to June 30, 1988, the record does not contain any evidence of any side effects which would interfere with the claimant performing the jobs identified by the vocational expert.

Prior to June 30, 1988, the claimant's activities of daily living were not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.

(Tr. at 16-18.)

21

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 404.1527(d)(2) (2002).   Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(d)(2) (2010).  The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2) (2000). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational.  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527.  These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors.  Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 404.1527(d)(2).

Under § 404.1527(d)(1), more weight is given to an examiner than to a non-

examiner.   Section 404.1527(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Section 404.1527(d)(2)(I) states that the longer a treating source treats a claimant, the more weight the source's opinion will be given.   Under § 404.1527(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Section 404.1527(d)(3), (4), and (5) adds the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

The court finds that the ALJ's decision reflects a careful consideration of Claimant's impairments, both alone and in combination in keeping with the applicable regulations. Contrary to Claimant's assertions, the ALJ did not disregard the opinion of Claimant's treating physician, Dr. Loimil, when considering Claimant's disability and functional capacity.   The undersigned concludes that the ALJ did not err in declining to give weight to Dr. Loimil's October 2, 2008 one-sentence letter stating: "I reviewed my records regarding Mr. Settle and I feel he has been continuously disabled due to his back condition from June 30, 1988 to the present time." (Tr. at 380.)   The ALJ rejected it because he found that Dr. Loimil provided "no objective evidence to support this statement." (Tr. at 18.)   The ALJ stated that while an ALJ will regularly give weight to a treating physician's specific medical findings, the ultimate disability determination is an administrative finding reserved to the Commissioner.  20 C.F.R. § 404.1527(e).

The Commissioner asserts that  "Dr. Loimil's opinion is contradicted by his notes

23

from the relevant time period." (Defendant's Brief at 12.)   The undersigned finds that  Dr. Loimil's October 2, 2008 statement – "I reviewed my records regarding Mr. Settle and I feel he has been continuously disabled due to his back condition from June 30, 1988 to the present time" – is not contradictory to his office treatment notes because Dr. Loimil does not state that he found Claimant to be disabled during the relevant time period (alleged onset date of March 15, 1984, through date last insured of June 30, 1988).   The plain wording of his statement clearly shows that Dr. Loimil considered Claimant to be disabled after the relevant time period, not during that time period. (Tr. at 380.) During the relevant time period, Dr. Loimil recommended on multiple occasions that Claimant receive vocational training, which clearly indicates that he believed Claimant could perform work. (Tr. 227, 228, 229, 230, 250.)  The ALJ noted that Dr. Loimil's treatment notes of June 14, 1988 indicated that Claimant's main functional limitations were heavy lifting, crawling, or climbing to heights. (Tr. at 230, 355) The ALJ included these limitations in his  residual functional capacity determination.  (Tr. at 20, 60-63.)

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence.  Accordingly, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: August 1, 2012

*Mary E. Stanley*
Mary E. Stanley
United States Magistrate Judge

24